IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.                                    CRIMINAL ACTION NO. 2:16-cr-00177

ANTOINE DERICUS WILMORE.

MEMORANDUM OPINION AND ORDER

I. INTRODUCTION

Fifteen weeks ago, I rejected the proffered plea agreement in the case of *United States v. Charles York Walker, Jr.*[1] after determining that it was not in the public interest. I must now decide whether, under Rule 11 of the Federal Rules of Criminal Procedure, to accept or reject the plea agreement between the defendant, Mr. Antoine Dericus Wilmore, and the government. As I noted in *Walker*, while Rule 11 gives defendants and prosecutors the ability to enter into plea agreements, it also obligates judges to accept or reject those agreements.[2] Rule 11 is silent on what I should or may consider in my decision.

It is the court's function to prevent the transfer of criminal adjudications from the public arena to the prosecutor's office for the purpose of expediency at the price of confidence in and effectiveness of the criminal justice system. The community of the Southern District of West Virginia must not be systemically excluded from its proper

---

[1] No. 2:17-cr-10, 2017 WL 2766452 (S.D. W. Va. June 26, 2017).

[2] Fed. R. Crim. P. 11.

place in this participatory democracy, especially with regard to the heroin and opioid crisis. The public cannot learn about or properly react to the conduct taking place in the streets of Charleston when that conduct is buried in a plea agreement dismissing the bulk of the provable criminal charges. Because I **FIND** that the plea agreement proffered in this case is not in the public interest, I **REJECT** it.

## II. BACKGROUND

### a. Factual Background

On September 13, 2016, a federal grand jury in Charleston, West Virginia returned an eight-count indictment against Antoine Dericus Wilmore in case number 2:16-cr-00177. [3] The indictment charged the defendant with four counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1); one count of aiding and abetting the distribution of heroin within 100 feet of a school in violation of 21 U.S.C. §§ 841(a)(1), 860, and 18 U.S.C. § 2; one count of aiding and abetting the distribution of heroin in violation of 21 U.S.C. § 841(a)(1); one count of possessing with the intent to distribute a quantity of heroin in violation of 21 U.S.C. § 841(a)(1); and one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). [4]

On May 3, 2017, the defendant and the government entered into a plea agreement. [5] The defendant agreed to plead guilty to Count Eight of the Indictment,

---

[3] *See* Indictment [ECF No. 1].

[4] *Id.*

[5] Plea Agreement [ECF No. 29].

which charged him with distributing heroin in violation of 21 U.S.C. § 841(a)(1).[6] In return, the government agreed to dismiss Counts 1–7 of the Indictment upon final disposition of the case.[7] At Mr. Wilmore's May 18, 2017 plea hearing, he pled guilty to Count Eight of the Indictment.[8] I accepted Mr. Wilmore's guilty plea, but I deferred acceptance of the plea agreement pending review of the defendant's presentence investigation report.[9] I have since reviewed this report.

Mr. Wilmore's presentence report reveals that he has a rather sparse criminal history. His convictions consist of driving infractions and a noise ordinance violation. However, the presentence report also details the investigation into the defendant's drug distribution activities, which occurred from April to August 2016. The investigation consisted of eight controlled buys, two executed search warrants, and a trash pull from the curb of the defendant's residence.

The presentence report details the following facts regarding the charged conduct. In April 2016, Mr. Wilmore moved to the Southern District of West Virginia from South Carolina. The first controlled buy occurred within his first month as a West Virginia resident. On April 13, 2016, a confidential informant ("CI") working with the Metropolitan Drug Enforcement Network Team (MDENT) contacted the defendant to arrange a purchase of heroin. The defendant instructed the CI to meet

---

[6] *Id.* at 2.

[7] *Id.*

[8] Written Plea [ECF No. 28].

[9] Plea Hr'g [ECF No. 25].

him at the Rite Aid by Littlepage Terrace in Charleston. The CI purchased 0.75 grams of heroin from the defendant for $80.

On May 27, 2016, MDENT officers conducted a trash pull at the defendant's residence. They found evidence indicating drug use and distribution.[10] Based on this information, the MDENT officers applied for and received a search warrant for this address.

The second and third controlled buys occurred on May 31, 2016 and June 1, 2016. On May 31, the defendant instructed the CI to meet him at Walgreens on Washington Street West in Charleston. At 2:20 p.m., Mr. Wilmore arrived and sold the CI 0.6 grams of heroin. On June 1, Mr. Wilmore again told the CI to meet him at Walgreens. When Mr. Wilmore did not arrive, the CI called to inquire regarding his whereabouts. Mr. Wilmore told him to go to the rear parking lot of Stonewall Jackson Middle School. At that location, a man distributed 1.6 grams of heroin to the CI, and then returned to Mr. Wilmore's residence.[11]

The next day, MDENT officers arrested Mr. Wilmore for possession with intent to deliver a controlled substance[12] and executed the search warrant on his residence. In the residence, the officers seized three guns and a safe containing five

---

[10] Specifically, the officers found loose tobacco consistent with individuals hollowing out cigars to fill with marijuana; suspected marijuana and a marijuana roach that field-tested positive for marijuana; and mail addressed to Antoine Wilmore. They also found approximately 25 plastic bags with the corners removed. According to the MDENT report, this is not only a typical manner in which drugs are packaged, but it is also consistent with the manner of packaging of the substance distributed by Mr. Wilmore during multiple controlled buys.

[11] Law enforcement indicated that the man distributing the heroin looked similar in appearance to Mr. Wilmore, but he appeared to have more facial hair and was slightly heavier than Mr. Wilmore.

[12] The arrest warrant was obtained based on the conduct that took place on April 13, 2016.

bags of heroin, one bag of marijuana, and two sets of digital scales. They also found $1,331 in currency, eighty dollars of which was identified as the pre-recorded currency from the June 1 controlled buy. While in custody, Mr. Wilmore admitted that he had recently sold heroin and that he had been purchasing fourteen grams at a time from another individual. On June 10, the pending charge against Mr. Wilmore was dismissed and a criminal complaint was filed, charging the defendant with only possession of a controlled substance, less than 15 grams, in Kanawha County Magistrate Court. On June 10, 2016, he accepted a plea that subjected him to six months' probation and required him to forfeit his vehicle and the money and firearms found during the execution of the search warrant.

Despite Mr. Wilmore's state sentence of probation, the controlled buys continued. On June 28, 2016, a CI contacted Mr. Wilmore to arrange a heroin purchase. Mr. Wilmore told the CI to go to KFC on Washington Street West, and he would send someone to meet him. At 3:03 p.m., a male arrived and delivered 0.5 grams of heroin to the CI. Later, this sample was tested and found to contain a mixture of heroin and fentanyl.

On June 30, 2016, a CI attempted to buy heroin from Mr. Wilmore. Mr. Wilmore responded that the police "were out on foot" so he could only sell marijuana. The CI agreed, and Mr. Wilmore sent someone to deliver 2 grams of marijuana to the CI at 2:30 p.m. at the KFC on Washington Street West.

On July 5, 2016, Mr. Wilmore sold 0.8 grams of heroin to a CI, who met him at

11:24 a.m. at the railroad tracks near Georgia Street. The substance was later found to contain a mixture of heroin and fentanyl.

On July 6, 2016, a CI attempted to buy heroin from Mr. Wilmore. Mr. Wilmore, however, stated that he did not have any at the moment, but that he could sell him marijuana. Mr. Wilmore met the CI at the western entrance of the Town Center Mall at 10:37 a.m. and sold the CI 2.4 grams of marijuana.

On August 8, 2016, a CI met Mr. Wilmore at Wendy's on Washington Street West. At approximately 12:32 p.m., Mr. Wilmore arrived and sold the CI 2.4 grams of heroin.

On August 11, 2016, law enforcement officers conducted a traffic stop of a car driven by Mr. Wilmore pursuant to an arrest warrant obtained due to the criminal conduct that allegedly occurred on July 5. The officers arrested Mr. Wilmore and confiscated a cell phone in his possession that matched the number used to facilitate many of the controlled buys. Following Mr. Wilmore's arrest, officers went to a location where he commonly stayed and found additional marijuana and a set of digital scales.

Ultimately, the presentence report attributes the following to Mr. Wilmore: distributing or possessing with the intent to distribute 12.761 grams of heroin, 0.609 grams of fentanyl, and 5.4 grams of marijuana; $1,251;[13] and multiple firearms.

---

[13] Officers found a total of $1,331 in currency during the search of Mr. Wilmore's residence. However, because $80 was determined to be from the June 1 controlled buy, that amount is subtracted from the total to determine the amount attributed to the defendant.

### b. Rule 11 of the Federal Rules of Criminal Procedure

As I stated in *Walker*, Rule 11 of the Federal Rules of Criminal Procedure grants a district judge the power to accept or reject a plea agreement.[14] I enjoy "broad discretion . . . when choosing to accept or reject plea agreements,"[15] and I am "not obligated to accept any recommendation or bargain reached by the parties."[16] The Advisory Committee Notes to Rule 11 expressly state: "The plea agreement procedure does not attempt to define criteria for the acceptance or rejection of a plea agreement. Such a decision is left to the discretion of the individual trial judge."[17] Other than granting the court broad discretion to accept or reject a plea agreement, Rule 11 provides no further guidance for the court.

## III. DISCUSSION

Because the common justifications behind plea bargaining "no longer have any substantial heft,"[18] it is essential that courts reexamine the system. In this case, as I did in *Walker*, I will examine the plea agreement proffered and determine whether it is in the public interest.[19] To do so, I will take into account the four factors set forth in *Walker*: (1) the defendant's conduct in light of the cultural context in which it

---

[14] Fed. R. Crim. P. 11(c). Congress, by virtue of the Rules Enabling Act and adoption of the Federal Rules of Criminal Procedure, has sanctioned the judge's power to accept or reject a plea agreement. *See* 28 U.S.C. § 2072; *see also* 1 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2 (4th ed. 2017) ("Congress . . . always retains the authority to approve, disapprove, or modify any proposed new rules or rule changes.").

[15] *In re Morgan*, 506 F.3d 705, 708 (9th Cir. 2007).

[16] *United States v. Dixon*, 504 F.2d 69, 72 (3rd Cir. 1974).

[17] Fed. R. Crim. P. 11 advisory committee's note to 1974 amendments.

[18] *See Walker*, 2017 WL 2766452, at *11.

[19] *Id.*

occurred, (2) the interest of the public in participating in adjudication of the conduct charged, (3) the public's ability to achieve community catharsis, and (4) the apparent motivation behind the plea agreement.[20] If I determine that the proffered plea agreement is not in the public interest, I will reject it.[21]

### a. The Defendant's Conduct in Light of the Cultural Context

First, I will identify the cultural context surrounding the defendant's criminal conduct and evaluate the gravity of the defendant's conduct in light of that context.[22] I have previously detailed the severe and devastating impact that the opioid crisis has had on this country and, particularly, on West Virginia.[23] Since then, the statistics have grown only more frightening. From 2015 to 2016, the number of deaths caused by heroin overdoses increased by nearly 17%, and the number caused by fentanyl (and its analogues) more than doubled.[24] Together, heroin, fentanyl, and prescription opioids currently account for nearly 78% of all drug-related deaths in 2016.[25] The devastation caused by synthetic opioids will only increase as the drugs

---

[20] *Id.* at *12

[21] *Id.* at *11.

[22] *Id.* at *12.

[23] *See id.* at *3–7.

[24] Ctr. for Disease Control, Nat'l Ctr. for Health Stat., *Provisional Counts of Drug Overdose Deaths, as of 8/6/2017*, at 2 (2017), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf. Deaths involving synthetic opioids, primarily fentanyl, have increased by 540%, from 3,000 to more than 20,000, in just three years. Josh Katz, *The First Count of Fentanyl Deaths in 2016: Up 540% in Three Years*, N.Y. Times (Sept. 2, 2017), https://www.nytimes.com/interactive/2017/09/02/upshot/fentanyl-drug-overdose-deaths.html.

[25] Ctr. for Disease Control, Nat'l Ctr. for Health Stat., *supra* note 24, at 2. As the numbers currently stand, drug overdoses killed roughly 64,000 people in the United States in 2016. *Id.* Approximately 20,100 of these involved fentanyl and fentanyl analogues, 15,400 involved heroin, and 14,400 involved

spread and additional analogues are created, gradually infecting and destroying the body politic.

It is clear that the influx of fentanyl and its analogues is exacerbating an already deadly epidemic.[26] Moreover, many people who use fentanyl and other synthetic opioids are unaware that they are doing so.[27] Fentanyl is cheap, easy to produce, and extremely potent.[28] Thus, the nation's illicit drug supply, especially its heroin, is increasingly laced with synthetic opioids, such as fentanyl.[29] For this reason, heroin users who fail to question what they are buying or who unwittingly, and mistakenly, trust their dealers never know which hit will be their last. They are playing an addict's game of Russian roulette with the dealers supplying the loaded guns.

My experience leads me to believe that most dealers neither know nor care if

---

prescription opioids. *Id.* These numbers may increase when the final report is issued in December 2017.

[26] Philadelphia's Health Commissioner, Thomas Farley, stated that fentanyl "has thrown gasoline onto a fire that was already raging." Nicole Lewis et al., *Fentanyl Linked to Thousands of Urban Overdose Deaths*, Wash. Post (Aug. 15, 2017), https://www.washingtonpost.com/graphics/2017/national/fentanyl-overdoses/?utm_term=.1885a80d41df

[27] *See* Joel Achenbach & Dan Keating, *Drug Crisis is Pushing Up Death Rates for Almost All Groups of Americans*, Wash. Post (June 9, 2017), https://www.washingtonpost.com/national/health-science/the-drug-crisis-is-now-pushing-up-death-rates-for-almost-all-groups-of-americans/2017/06/09/971d8424-4aa1-11e7-a186-60c031eab644_story.html?utm_term=.fb5fa08fa8f4; Addy Baird, *Fentanyl Deaths Increasing, But Many Users Remain Unaware of Dangers*, Politico (Oct. 18, 2016, 5:32 a.m.), http://www.politico.com/states/new-york/albany/story/2016/10/fentanyl-deaths-are-on-the-rise-but-many-users-remain-unaware-106463.

[28] *See* Baird, *supra* note 27. In fact, fentanyl is so potent that it is about fifty times stronger than heroin. Lewis et al., *supra* note 26.

[29] Lewis et al., *supra* note 26.

what they are selling as heroin has been adulterated. Such adulteration actually gives the dealer a competitive edge and keeps the customers hooked on that supply.[30] Even an overdose here and there can be good for business. "If word of an overdose from the lethal bag spreads, drug users seek out the dealer—because they know that dealer has the strongest product, the best fix for the money."[31]

Mr. Wilmore's conduct was clearly that of a businessman. He moved to the Southern District of West Virginia in April 2016, and he sold heroin to a CI on the thirteenth of that month. Never a heroin user himself,[32] Mr. Wilmore exploited the rampant addiction in the Southern District of West Virginia in order to turn a profit.[33] During a time period of less than four months, CIs conducted eight controlled buys from the defendant, six of which were heroin sales and two of which were marijuana sales. An arrest and conviction during this four-month period did not deter the defendant from continuing his criminal enterprise. Following his arrest, Mr. Wilmore pled guilty to possession of a controlled substance in state court and was placed on six months' probation. Two weeks into his probation sentence, he sold a mixture of heroin and fentanyl to a CI. This was not the only time Mr. Wilmore sold fentanyl. Over the course of two controlled buys, the defendant was involved in the

---

[30] *See* Baird, *supra* note 27.

[31] Lewis et al., *supra* note 26. Some dealers go so far as to intentionally insert a bag with a lethal dose of fentanyl into each batch they sell. *Id.* This ensures an overdose and, thus, better customer reviews. *See id.*; Baird, *supra* note 27.

[32] During Mr. Wilmore's presentence investigation, he admitted only to using marijuana. He denied any history of drug abuse.

[33] MDENT officers searched Mr. Wilmore's residence on June 2, 2016 and seized $1,331 of drug proceeds.

sale of 0.609 grams of fentanyl.[34] This means that in the combined 1.3 grams of substance sold as "heroin" on these two occasions, there were between 200 and 300 lethal doses of fentanyl.[35]

Mr. Wilmore disregarded the public safety not only by distributing deadly substances but also by doing so in a dangerous manner. Contrary to popular imagery, not all drug deals take place in back alleys in the dead of night. As Mr. Wilmore's conduct makes clear, armed dealers[36] are selling drugs in broad daylight at our local Walgreen's, at the Town Center Mall, and even in the parking lot of our children's middle schools.

### b. The Public's Interest in Participating in Adjudication of the Criminal Conduct Charged

Next, I must evaluate the public's interest in participating in the adjudication of the criminal conduct charged.[37] Of paramount importance is the public's

---

[34] Laboratory analysis was conducted on the substances sold on June 28, 2016 and July 5, 2016. The testing confirmed that the substances contained a combined total of 0.609 grams of fentanyl.

[35] A lethal dose of fentanyl is estimated to be somewhere between 2 and 3 milligrams. *See* Allison Bond, *This Photo Shows Exactly Why Fentanyl is Deadlier Than Heroin*, PBS (Sept. 30, 2016), http://www.pbs.org/newshour/rundown/fentanyl-deadlier-heroin-single-photo/ (stating three milligrams of fentanyl is "enough to kill an average-sized adult male"); *Fentanyl Drug Profile*, European Monitoring Ctr. for Drugs & Drug Addiction, http://www.emcdda.europa.eu/publications/drug-profiles/fentanyl (last visited Oct. 10, 2017) ("The estimated lethal dose of fentanyl in humans is 2 mg."); Sarah Zhang, *Fentanyl is So Deadly That It's Changing How First Responders Do Their Jobs*, Atlantic (May 15, 2017), https://www.theatlantic.com/health/archive/2017/05/fentanyl-first-responders/526389/ (estimating a lethal dose of heroin at three milligrams).

[36] It is not clear from the presentence report whether Mr. Wilmore was actually in possession of a weapon at the time of the controlled buys. However, during the search of Mr. Wilmore's residence, officers located three guns, one of which had previously been reported stolen.

[37] *See Walker*, 2017 WL 2766452, at *12.

deeply-rooted interest[38] in a criminal trial by jury. This interest increases in direct proportion to the severity of the threat to the safety of the community from which the jury will be selected. Thus, when criminal activity is carried out in the context of a dangerous and devastating epidemic and involves conduct so dangerous to the Southern District of West Virginia, the public's interest in participation is at its zenith.

Juries are vital to a vibrant democracy[39] and to a transparent and effective criminal justice system. This is a government "of the people, by the people, for the people."[40] The public holds a collective interest that litigants and jurists cannot disregard or discard. In criminal cases, the interest in a jury trial is so important the Constitution mentions it twice. Article III section 2 of the Constitution states: "The Trial of all Crimes . . . shall be by Jury; and such Trial shall be held in the State

---

[38] Some scholars and jurists have gone so far as to recognize this interest as a constitutional "right" guaranteed by Article III. *See, e.g.*, Stephanos Bibas, *Originalism and Formalism in Criminal Procedure: The Triumph of Justice Scalia, The Unlikely Friend of Criminal Defendants?*, 94 Geo. L.J. 183, 196–97 (2005) (contending that Article III of the Constitution was intended to protect the right of the community to administer justice, and not the right of the individual); Steven A. Engel, *The Public's Vicinage Right: A Constitutional Argument*, 75 N.Y.U. L. Rev. 1658, 1705–06 (2000) (asserting that the public has a constitutional right to administer justice locally and adjudicate criminal trials); Nicholas Quinn Rosenkranz, *Condorcet and the Constitution: A Response to the Law of Other States*, 59 Stan. L. Rev. 1281, 1298 (2007) (referencing Akhil R. Amar's conclusion that the jury was meant to be a local institution). *See generally* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) (advocating the idea that the Bill of Rights and Constitution are carefully and mindfully constructed with specific rights, including the right to a jury trial, created to educate and empower the public); Laura I. Appleman, *The Lost Meaning of the Jury Trial Right*, 84 Ind. L.J. 397 (2009) (arguing that the Sixth Amendment jury trial right is actually a restatement of the collective right in Article III).

[39] "Jury service preserves the democratic element of the law . . . . Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Powers v. Ohio*, 499 U.S. 400, 407 (1991).

[40] Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863).

where the said Crimes shall have been committed . . . ."[41] The Sixth Amendment of the Bill of Rights states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."[42] Article III gives citizen-jurors "a non-waivable, structural check on judicial and prosecutorial overreaching."[43] Notably, Article III is not phrased as an individual right like the Sixth Amendment, and it has not been interpreted as such. "It was meant to be a right of We the People to administer justice, not simply a right of defendants to waive (or be coerced into waiving)."[44] Additionally, despite the Sixth Amendment's phrasing and interpretation as an individual right of the accused, this right is limited by the public's collective interest bestowed in Article III.[45]

The criminal jury trial inherently furthers the ideals of deterrence, retribution, and rehabilitation, and it maintains an appropriate balance of power

---

[41] U.S. Const. art. III, § 2, cl. 3.

[42] U.S. Const. amend. VI.

[43] Bibas, *supra* note 38, at 196.

[44] *Id.* at 196–97

[45] The Supreme Court has generally interpreted the Sixth Amendment's jury trial right as an individual right of the accused. *See Patton v. United States*, 281 U.S. 276, 293 (1930). However, the Court has also acknowledged a public interest in a criminal trial by jury that is entirely distinct from the protection of the accused. *See, e.g., Powers*, 499 U.S. at 406 (1991) ("The opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principal justifications for retaining the jury system."); *Gannet Co. v. DePasquale*, 443 U.S. 368, 415–416 (1979) ("The Court . . . previously has recognized that the Sixth Amendment may implicate interests beyond those of the accused."). For further discussion of how Article III's jury trial guarantee protects rights other than those of the accused, *see* Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131, 1196–99 (1991).

between the three branches of government.[46] The plea bargaining process is eroding these democratic values. As the late William J. Stuntz observed, the plea bargaining process

> is a modest problem or no problem at all when the number of criminal trials is high: the public can see how the system functions in a large fraction of its cases, and prosecutors and defense attorneys alike must strike plea bargains with an eye toward likely trial outcomes. When trials are rare events, as is the case today, the public sees little. . . . Plea bargains are no longer a means of settling easy cases, which is their proper role. Rather, guilty pleas and the quick bargains that precede them have become the system's primary means of judging criminal defendants' guilt or innocence.[47]

Thus, the United States criminal justice system has transitioned from a realm of public participation to one of public exclusion where justice is dealt and plays out in backroom deals and empty courtrooms.[48] The Founding Fathers "had no intentions of leaving criminal punishment to the government." [49] Today, however, most adjudications of guilt are determined by agreement between the government and the

---

[46] Indeed, when a prosecutor is allowed to act as judge and jury, there is a breakdown of the democratic and political processes. It seems obvious that "[w]hen it comes to law execution, the genius of the separation of powers is that, typically, two branches must independently conclude that some party has violated the law before anyone is punished. The benefit is clearly absent when the executive and judiciary are one and the same." Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 545 n.147 (2005).

[47] William J. Stuntz, *The Collapse of American Criminal Justice* 302 (2011).

[48] *Id.* ("Guilty pleas, especially ones that happen early in the process, are largely invisible. So is the bargaining that lies behind them.").

[49] Appleman, *supra* note 38, 403. "The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities,' and they were particularly focused on the dangers of legislative encroachment on the judicial power over crime." Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1012 (2006) (quoting *INS v. Chadha*, 462 U.S. 919, 961 (1983)).

defendant.[50]  In this district's standard plea agreement, even the defendant's right to appellate review is contingent on the conformance of the judge's sentence to the guideline calculation agreed to by the parties. Such an administrative system where the prosecutor acts as judge and jury poses a danger that the Framers intended to prevent.[51]

### c.  The Public's Ability to Achieve Community Catharsis

The public's interest in jury trials is broader than its interest in democratic government participation. The jury trial also has an additional purpose—serving the "welfare and efficacy of the community at large."[52] The jury trial creates a more educated populace that respects the law and has faith in the judicial system. Because it allows community participation in the judicial branch of government, the jury trial is "one of the most efficacious means for the education of the people which society can employ."[53]

The jury trial also instills or reaffirms the public's faith in the criminal justice

---

[50] Erica Goode, *Stronger Hand for Judges in the 'Bazaar' of Plea Deals*, N.Y. Times (Mar. 22, 2012), http://www.nytimes.com/2012/03/23/us/stronger-hand-for-judges-after-rulings-on-plea-deals.html.

[51] *See* John H. Langbein, *On the Myth of Written Constitutions: The Disappearance of Criminal Jury Trial*, 15 Harv. J.L. & Pub. Pol'y 119, 124 (1992) ("Plea bargaining achieves just what the Framers expected the jury to prevent, the aggrandizement of state power.").

[52] George C. Harris, *The Communitarian Function of the Criminal Jury Trial and the Rights of the Accused*, 74 Neb. L. Rev. 804, 807 (1995).

[53] *Powers*, 499 U.S. at 407 (quoting 1 Alexis de Tocqueville, *Democracy in America* 334–37 (Schocken 1st ed. 1961) (1835)). As Alexis de Tocqueville stated, the jury "may be regarded as a gratuitous public school ever open, in which every juror learns to exercise his rights . . . and becomes practically acquainted with the laws of his country. . . ." 1 Alexis de Tocqueville, *Democracy in America* 290 (Henry Reeve trans., Colonial Press rev. ed. 1899) (1835).

system. [54] It "allows peaceful expression of community outrage at arbitrary government or vicious criminal acts."[55] Conversely, the people's confidence in their government suffers when it begins to function less like a government "by the people" and more like an administrative agency. The government of the United States is meant to be owned by its citizens, yet these citizens are increasingly excluded from government function. As people lose their sense of government ownership, they lose their sense of importance and the mindset that every individual citizen has a role in the government. Citizens then lose interest and become cynical, become skeptical, and lose respect for their government.

As our system moves further and further away from the jury trial and toward a system in which adjudications of guilt and innocence are made behind closed doors, we risk losing the benefits of the jury trial and the public's faith in its usefulness in finding justice and truth. This risk is great in cases, such as the one before me, that strongly implicate public health and safety. A plea agreement like the one proffered in this case, which dismisses seven counts of serious criminal charges, effectively acts to conceal the criminal conduct at issue.[56] This leaves the public unable to respond to the criminal activity threatening this community. I am not suggesting that the

---

[54] Harris, *supra* note 52, at 805.

[55] *United States v. Lewis*, 638 F. Supp. 573, 580–81 (W.D. Mich. 1986) (holding that community input through a jury trial is not an overriding or compelling governmental interest to burden the defendant's free exercise of religion).

[56] *See* Langbein, *supra* note 51, at 124 (1992) ("Plea bargaining prevents the citizenry from learning about the circumstances of the crime and punishment. There is, for example, a lingering distaste among substantial sections of the American people about the way that James Earl Ray was sent off to prison in Tennessee. Without trial, we do not feel adequately informed about whether our institutions have responded fully and fairly to events.")

people are unaware of the opioid epidemic. I do believe that many in our community do not understand how this epidemic operates.[57] Jury service permits the public to learn the circumstances surrounding the conduct of those involved in the epidemic and to decide for themselves whether the criminal justice system is adequately responding to this criminal plague.

### d. The Apparent Motivation Behind the Plea Agreement

Finally, I will examine the plea agreement and determine whether, in light of the presentence report, the parties' primary motivation is to advance justice or to avoid trial.[58] I must of course weigh the prosecution's strong interest in securing final adjudication on a criminal charge and the defendant's liberty interest in the outcome of his or her case. But I must balance these interests against the people's interest in active participation in the adjudication of charges brought by the grand jury. As discussed previously,[59] the public always has a significant interest in deterring criminal behavior. Certain cases present issues of such magnitude that the public's interest in active participation through the jury trial process is extremely important.[60] This case, which involves the very present and deadly threat of the heroin and opioid epidemic in this district, falls into this category.

The government also argues that I should accept the plea agreement because

---

[57] As this case demonstrates, there are daytime drug deals at our pharmacies, our fast food restaurants, and even our schools.

[58] *See Walker*, 2017 WL 2766452, at *12.

[59] *See* supra Section IIIB–C.

[60] *Id.*

the terms of the agreement ensure that the defendant "would not object to a guideline calculation that included all relevant conduct in the case."[61] In other words, the government contends that dismissing counts of criminal behavior does not affect the ultimate disposition since I can and should take into account the activity underlying the dismissed counts when calculating the defendant's sentence.

This argument, which forms the foundational justification for the current plea-bargaining regimen in this district, mischaracterizes my discontent with such plea agreements, as articulated in *Walker*.[62] The ill effects of these plea bargains has little to do with my discretion to determine the length of sentence and much to do with the deleterious effects arising from the lack of public participation.[63] The government, instead of proving its case beyond a reasonable doubt, relies on the probation officer to prove the conduct by a preponderance of the evidence in the presentence report and relies on the court to apply that behavior as relevant conduct in calculating the defendant's proper sentencing guideline range.

Here, the prosecution is willing to plead away seven counts of criminal activity

---

[61] *See* Sentencing Mem. United States 4 [ECF No. 31].

[62] *See, e.g.*, *Walker* at 2017 WL 2766452, at *14 ("The secrecy surrounding plea bargains in heroin and opioid cases frequently undermines respect for the law and deterrence of crime. The bright light of the jury trial deters crime, enhances respect for the law, educates the public, and reinforces their sense of safety much more than a contract entered into in the shadows of a private meeting in the prosecutor's office.").

[63] The test presented in *Walker* is not concerned with mandatory minimums and maximums nor with guideline ranges. It is concerned with the people's inclusion in our system of justice, especially when the system of justice is engaged in the adjudication of issues so important to the public well-being. *Id.* at *1 ("The community of the Southern District of West Virginia must not be systemically excluded from its proper place in this participatory democracy, especially with regard to the heroin and opioid crisis.").

resulting from conduct that feeds a most acute public health crisis. This is conduct that the public has a very strong interest in knowing about. A backroom deal between a prosecutor and a defendant cannot be a substitute for active public participation in cases of such enormous import to the community.

In further support of its recommendation that I accept Mr. Wilmore's plea agreement, the government advances the argument that we must protect the safety, and thus the identity, of CIs. Plea bargaining, the government says, "reduces the risk of retaliation that such cooperating individuals otherwise may face" and "encourag[es] cooperation with law enforcement in the battle against heroin distribution."[64]

While I am mindful of the risks to cooperating individuals,[65] if I were to rely upon the government's reasoning in every case, the public's interest in participating in the adjudication of criminal conduct would never be satisfied. There are witnesses in virtually every criminal case—witnesses who are constitutionally required to testify at trial to implicate the defendant.[66] Protecting these witnesses from intimidation and harm is important, but it is hardly a justification for offering plea bargains to all criminal defendants.

Furthermore, the government does not ask me to protect its witnesses in every

---

[64] Sentencing Mem. United States 4.

[65] "Once an informant is known, the drug traffickers are quick to retaliate. Dead men tell no tales." *Roviaro v. United States*, 353 U.S. 53, 67 (1957) (Clark, J., dissenting).

[66] *See* U.S. Const. amend VI ("[I]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.").

case. It only calls for the protection of witnesses who have run afoul of the law and work for the police in return for money and leniency. [67] We offer no such remuneration to the good citizen who witnesses a crime and is called to court to testify, nor should we. Yet, the government has constructed and administers a system where the law-abiding witness is left with no special protection, and the scofflaw witness is paid, rewarded, and protected. I will not approve an otherwise unacceptable plea agreement in order to protect the safety of criminals on the government's payroll.

Finally, the parties in this case seem to be primarily motivated by the desire to avoid trial. Despite four months of investigative efforts, eight controlled buys, multiple search warrants, and an eight-count indictment, the government is willing to dismiss seven of these counts if the defendant pleads guilty to a single count of heroin distribution. From all I have been given to consider, I find the primary justification for this plea agreement to be convenience.

## IV. CONCLUSION

There has long been a belief that drug distribution is a "victimless crime." The true victims here are the people of the Southern District of West Virginia. The

---

[67] Informants provide information to the government in exchange for various benefits, including monetary payments, reductions in sentence, immunity from prosecution, and even the freedom to persist in criminal activity. Alexandra Natapoff, *Snitching: Criminal Informants and the Erosion of American Justice* 32, 47–54 (2009).

current heroin and opioid epidemic is carving a path of pain and suffering that cuts across race, socioeconomic status, and age and afflicts everyone in our community.[68]

I refuse to accept plea agreements in the interest of expediency at the cost of a public health disaster. I will, in this case and in all future cases, determine whether the plea agreements reached are truly in the public interest. The plea agreement proffered in this case is not in the public interest, and, therefore, I **REJECT** it.

The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:     October 10, 2017

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

---

[68] "It cuts across all demographics, race, gender, socioeconomic status. . . . It's everywhere all the time." Lewis et al., *supra* note 26 (quoting former Administrator of the Drug Enforcement Administration, Chuck Rosenberg).